OPINION OF THE COURT
Louis D. Laurino, S.
This is a proceeding by the attorney in fact for alleged distributees of decedent, all of whom reside in the U. S. S. R, to . withdraw funds deposited with the Finance Administrator by order of this court pursuant to SCPA 2222.
The petitioner moves to take the testimony of one of the alleged distributees and of a nonparty witness by means of letters rogatory addressed to an appropriate court or tribunal in the U. S. S. R. Both of these individuals reside in Moscow.
The Attorney-General, who appears for the comptroller and the people of New York, opposes the application on a number of grounds, one of which is that there is no reason stated in the moving papers as to why the proposed witnesses cannot attend a hearing in New York and be subject to cross-examination. A reading of the moving papers shows that not only is no reason given as to why that alternative cannot be utilized, but no explanation is offered as to why some other disclosure device such as a commission on written interrogatories addressed to a United States consular officer in Moscow cannot be utilized before resort is had to this least favored of disclosure devices.
The court is aware of cases which hold that letters rogatory are the only available means of taking testimony in the Soviet Union (Matter of Rasima, NYLJ, May 9, 1979, p 13, col 2; Matter of Newman, NYLJ, Aug. 7, 1978, p 15, col 3). These *767 cases appear to rely on Matter of Einhorn (138 NYS2d 840, affd 285 App Div 1143) as proof of this "fact”.
Matter of Einhorn (supra) was decided in January, 1955. All that Surrogate Collins said on the subject was: "It is not disputed that the only available method of taking testimony in the Soviet Union is through letters rogatory. See Ecco High Frequency Corp. v Amtorg Trading Corp., 196 Misc. 405, 406, 94 N.Y.S.2d 400, 402.” (Matter of Einhorn, supra at p 841.)
In Ecco High Frequency Corp. v Amtorg Trading Corp. (supra, p 406) decided in 1949, Justice Corcoran stated: "It is apparent that the ordinary commission, open or closed, is not available for the taking of testimony in the Union of Soviet Socialist Republics and that Tetters rogatory are the only means through which testimony may be obtained. Consequently, letters rogatory should be transmitted through the diplomatic channel in order that the necessary requirements may be met’. (2 Moore on Federal Practice 2555; U.S. Neck-ware Corporation v. Sinaco Co., 176 Misc. 51.)”
U. S. Neckware Corp. v Sinaco Co. (supra) weighed the value of the issuance of letters rogatory to a court in Switzerland and the relative advantages and disadvantages of having the foreign court apply its own rules and practices under letters rogatory, coupled with its power to compel the attendance of witnesses against the appointing of a commission to take testimony under New York rules and practices without the power to compel the appearance of witnesses. Insofar as the narrow question of whether letters rogatory are the only means of securing the testimony of witnesses in the Soviet Union is concerned, it is not germane.
The reference to Professor Moore’s work, Moore’s Federal Practice, was to the 1938 edition. The full paragraph from which the quote is taken (2 Moore, Federal Practice [1938 ed], p 2555) reads: "In Germany, Poland and Greece letters rogatory may be executed only in certain circumstances. In some countries it is necessary to supply translations of the letters rogatory in the language of the country in which they are to be executed; in other countries, for example, Switzerland, Japan and the Union of Soviet Socialist Republics, letters rogatory are the only means through which testimony may be obtained. Consequently, letters rogatory should be transmitted through the diplomatic channel in order that the necessary requirements may be met.” The text cites no authority for the statements contained in it.
*768 The basic text, quoted above with significant modifications in the form of omissions is now found in Moore, Federal Practice (2d ed, vol 4, par 28.08). No mention is made of the U. S. S. R. in that part of the text. However, under paragraph 28.06[2] of the same volume there is a statement (p 1937) that, "Some foreign countries do not allow a person appointed by a court of another * * * to sit within their jurisdictions to take testimony by deposition.”
A footnote to this sentence states (p 1937, n 2), "This is true for example, in Switzerland, the U.S.S.R. and Yugoslavia”. Again, no authority is given for this statement and the page in question was copyrighted in 1963.
In commenting on this statement Surrogate Bloom stated in Matter of Padolsky (NYLJ, Feb. 2, 1979, p 12, col 1): "At least one country mentioned in Moore as prohibiting the taking of testimony within its jurisdiction by a person appointed by a foreign court has permitted, and, in fact, actually participated in the taking of depositions within its jurisdiction when the persons interested in distribution of the estate were their nationals (Matter of George, order dated July 20, 1978).”
It is possible that other evidence was presented to Surrogate Collins and to Justice Corcoran on which they based their respective findings regarding the availability of other means of deposing witnesses in the Soviet Union which does not appear in their decisions. However, this is mere conjecture and at this point the unsupported statement in Moore, Federal Practice (1938 ed, p 2555) seems to be the basis for this finding. These unsupported statements are of no weight to this court.
On the other hand, there is strong evidence, on paper at least, that since 1975 the Soviet authorities would allow party witnesses and possibly nonparty witnesses who are citizens of the U. S. S. R. to appear before courts in the United States and/or before commissioners appointed by such court to give testimony where the right of such citizens may be affected. Further, it appears that the Soviet authorities would co-aperate with such procedures.
On August 1, 1975 at Helsinki, Finland, the "Final Act of the Conference on Security and Cooperation in Europe” (hereinafter referred to as the "Helsinki Accord”) was executed by the participating States (73 US State Dept Bull 323). Both the United States and the Union of Soviet Socialist Republics were signatories to the accord.
*769 Section I of article 1 (a) of the Helsinki Accord provides:
"Sovereign equality, respect for the rights inherent in sovereignty. The participating States will respect each other’s sovereign equality and individuality as well as all the rights inherent in and encompassed by its sovereignty, including in particular the right of every State to juridical equality, to territorial integrity and to freedom and political independence. They will also respect each other’s right freely to choose and develop its political, social, economic and cultural systems as well as its right to determine its laws and regulations.
"Within the framework of international law, all the participating States have equal rights and duties. They will respect each other’s right to define and conduct as it wishes its relations with other States in accordance with international law and in the spirit of the present Declaration. They consider that their frontiers can be changed, in accordance with international law, by peaceful means and by agreement. They also have the right to belong or not to belong to international organizations, to be or not to be a party to bilateral or multilateral treaties including the right to be or not to be a party to treaties of alliance; they also have the right to neutrality.”
Section VII of article 1 (a) provides:

"Respect for human rights and fundamental freedoms, including the freedom of thought, conscience, religion or belief.

"The participating States will respect human rights and fundamental freedoms, including the freedom of thought, conscience, religion or belief, for all without distinction as to race, sex, language or religion.
"They will promote and encourage the effective exercise of civil, political, economic, social, cultural and other right and freedoms all of which derive from the inherent dignity of the human person and are essential for his free and full development.
"Within this framework the participating States will recognize and respect the freedom of the individual to profess and practise, alone or in community with others, religion or belief acting in accordance with the dictates of his own conscience.
"The participating States on whose territory national minorities exist will respect the right of persons belonging to such minorities to equality before the law, will afford them *770 the full opportunity for the actual enjoyment of human rights and fundamental freedoms and will, in this manner, protect their legitimate interests in this sphere.
"The participating States recognize the universal significance of human rights and fundamental freedoms, respect for which is an essential factor for the peace, justice and well-being necessary to ensure the development of friendly relations and co-operation among themselves as among all States.
"They will constantly respect these rights and freedoms in their mutual relations and will endeavour jointly and separately, including in co-operation with the United Nations, to promote universal and effective respect for them.
"They confirm the right of the individual to know and act upon his rights and duties in this field.
"In the field of human rights and fundamental freedoms, the participating States will act in conformity with the purposes and principles of the Charter of the United Nations and with the Universal Declaration of Human Rights. They will also fulfill their obligations as set forth in the international declarations and agreements in this field, including inter alla the International Covenants on Human Rights, by which they may be bound.”
The right to inherit personal property is guaranteed as a "social” right under article X of the Constitution of the Union of Soviet Socialist Republics.
The right to inherit is so basic in Anglo-American Law that its source is not questioned, but rather presumed in most litigation involving the issue of inheritance. However, as there may be readers of this decision who are unfamiliar with Anglo-American jurisprudence, the present right of inheritance is set down in EPTL 4-1.1. EPTL 4-1.1 itself derives from a series of statutes that trace their origin back to the time when New York was a colony of England (NY Const, art I, § 14), and before that through English common law back to the Magna Carta (arts 2, 3, 7, 8, 18, 26, 27).
The United States Federal Government’s recognition and guarantee of the individual’s right to inherit and the State court’s right to hear matters involving the same is set forth in the Tenth Amendment to the Constitution of the United States.
Having allowed these persons to become parties to a pro *771 ceeding before this court to enforce a human right recognized by both nations,[1] for the Soviet Union to deny these parties the privilege to pursue this right by appearing before this court or a person appointed by it or the laws of New York State to give testimony and to limit the means by which their testimony may be secured to letters rogatory addressed to a Soviet tribunal, would appear to be violative of both section I of article 1 (a) of the Helsinki Accord (supra) in that it is a failure to respect the sovereign equality and individuality of a juridical organ of the United States; and a violation of section VII of article 1 (a) of the Helsinki Accord (supra) in that it fails to confirm the right of the individual party to act upon his rights. The court does not believe it is the intention of the Soviet authorities to so act.
On the other hand, for this court to issue letters rogatory to a court in the Soviet Union to take the testimony of a party without a showing of extraordinary circumstances and over an objection that this method of securing testimony would effectively deprive one of the parties of the right to cross-examine, together with the distinct possibility that at a hearing before a Soviet tribunal the Soviet nationals would have the assistance of local counsel, while the other parties perforce cannot, would be violative of the due process and equal protection clauses of the United States Constitution, as set forth in the Fourteenth Amendment (cf. Matter of Padolsky, NYLJ, Feb. 2, 1979, p 12, col 2, supra; Matter of Janes, NYLJ, April 25, 1979, p 12, col 3; Matter of Panacik, NYLJ, Dec. 4, 1979, p 12, col 1; Bowen v Havana Elec. Ry. Co., 146 App Div 672; Drew v Drew, 195 Misc 466).
Accordingly, the motion insofar as it seeks to take the testimony of a party witness is denied.
As to the nonparty witness, a slightly different situation exists. People appear before the courts to give testimony for a variety of reasons. Some appear voluntarily out of a disinterested respect for justice and the truth; some appear voluntarily through friendship with one of the parties who has elicited *772 their testimony, and some appear only when compelled to by subpoena or court order.
As to the first and second type of witness, there is no reason why the Soviet authorities should prevent these persons, if they are willing and able, to appear either before this court or its representative to give testimony, the freedom of conscience and the freedom to act in friendship being fundamental rights guaranteed by section VII of article 1 (a) of the Helsinki Accord.
In the third situation, this court has no power to compel the production of an unwilling witness residing in the Soviet Union to appear before it or its representative, and for it to attempt to do so without the co-operation of the Soviet authorities would be a violation of section I of article 1 (a) of the Helsinki Accord and other international treaties. It is to secure the testimony of this type of witness that courts resort to the issuance of letters rogatory to the courts and tribunals of another nation (Decauville Auto. Co. v Metropolitan Bank, 124 App Div 478).[2]
*773 There is nothing in the moving papers that indicates what the proposed witness is expected to testify to or what her position is as to appearing voluntarily, either before this court or its representative in Moscow.
Common sense and the line of questions directed in the moving papers to this proposed witness indicate that there has been contact between the witness and either the parties or their legal representatives in the Soviet Union or the United States. A statement should be obtained from either the witness or someone who is in contact with her as to her willingness or nonwillingness to appear before this court or a representative to be appointed by it to take testimony in Moscow. This may be done on any future application as the court is denying the present application for the reasons stated heretofore and hereafter.
Besides the general opposition voiced by the Attorney-General to the issuance of letters rogatory, the papers in opposition also contain objections to the particular questions proposed. To determine the validity of these objections the court has reviewed the prior proceedings and the minutes and evidence which have been presented at the present hearings being held before a Special Referee.
The court finds that the second proposed question addressed to the nonparty witness, to wit: "Did you know the decedent, samuel vilensky, also known as Solomon vilensky, (hereinafter referred to as the decedent)?”, presupposes a number of facts which are not in evidence, namely, that the person she knew was the decedent and that he was also known as Solomon Vilensky. The court records indicate the decedent was known by a number of names, Sam Vilensky, Samuel Vilensky, Sam Wishinsky and Samuel Wishinsky. There is nothing in the prior records or the present hearing to indicate that he was known as Solomon Vilensky. The objection is, therefore, sustained. (CPLR 3115; Gray v Brooklyn Hgts. R. R. Co., 175 NY 448.)
As the questions that follow are based on the answer to be given to this question, the objection is also sustained as to those questions.
The time within which the petitioners must complete their *774 presentation of testimony and evidence is extended for six months from the date of the next hearing scheduled before the Special Referee.

. That the Soviet authorities recognize the right of the alleged distributees in this matter to inherit from the decedent and to pursue this right as parties in this court can be inferred from the fact that the alleged distributees have executed bilingual powers of attorney referring to their status and giving the attorney in fact the power to proceed in this court before State notaries in the Soviet Union. The converse fact to be implied from this is a recognition of this court’s jurisdiction to hear the matter under its own evidentiary rules and procedures.

. There is no reason why a method of co-operation cannot be developed between the courts of the Soviet Union and the United States whereby the sovereignty of both courts, their due process requirements and the rights of the parties and nonparty witnesses under both systems of law can be mutually respected, fostered and protected so that the ends of justice may be met. The criticism levelled at letters rogatory in this decision and other decisions cited herein is as to how they are normally presented. Namely, that the issuing court request the foreign court to compel the appearance of the witness before it, to ask the witness a series of written questions attached to the letters rogatory and return the answers to the issuing court with the letters rogatory. The questions are proposed and the answers recorded under the procedures of the foreign court. Letters rogatory are also addressed to a foreign court to secure the production of a record within its jurisdiction.
In its broadest sense, letters rogatory are a request from one court to a foreign court to do something for it out of comity. In this sense, a letter rogatory addressed to the appropriate tribunal in the Soviet Union to summon the proposed witnesses before it to qualify them and to allow them to be questioned and their answers recorded in accordance with the laws of New York, as requested in the letters rogatory, would, if accepted by the Soviet tribunal, also be acceptable by this court.
It appears that this procedure may be utilized under section 11 of chapter 223A of the Massachusetts General Laws, which provides: "A court of this commonwealth may order a person who is domiciled or is found within this commonwealth to give his testimony or statement or to produce documents or other things for use in a proceeding in a tribunal outside this commonwealth. The order may be made upon the application of any interested person or in response to a letter rogatory and may prescribe the practice and procedure, which may be wholly or in part the practice and procedure of the tribunal outside this commonwealth, for taking the testimony or statement or producing the documents or other things. To the extent that the order does not prescribe otherwise, the practice and procedure shall be in accordance with that of the court of this commonwealth issuing the order. The order may direct that *773 the testimony or statement be given, or document or other thing produced, before a person appointed by the court. The person appointed shall have the power to administer any necessary oath.”